Matthew Hearle (MH-3596)
GOLDBERG WEPRIN & USTIN LLP
Attorneys for Plaintiff
1230 PARK ASSOCIATES, LLC
1501 Broadway
New York, New York 10036
(212) 221-5700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

1230 PARK ASSOCIATES LLC and MYRTLE          Docket No.  07 CV 3743
BOULEVARD ASSOCIATES LLC,

                    Plaintiffs,

        - against -                                        **COMPLAINT**

HIRAM STURM,

                    Defendant.
------------------------------------------------------------------X

        Plaintiffs 1230 Park Associates LLC and Myrtle Boulevard Associates LLC, by their

attorneys, Goldberg Weprin & Ustin LLP, as and for its complaint against defendant Hiram

Sturm, respectfully alleges as follows:

### JURISDICTION

        1.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§1332(a)(2) in that the matter in controversy exceeds the sum of $75,000.00, exclusive on

interest and costs, and is between plaintiffs, citizens of New York, and defendant, a citizen of

Georgia.

1

## VENUE

2.   Venue lies in this district pursuant to 28 U.S.C. §1391 because it is the district in which plaintiffs' claims arose.

## THE PARTIES

3.   Plaintiff 1230 Park Associates, LLC ("1230 Park Associates") is a New York limited liability company with an address of One West Red Oak Lane, White Plains, New York 10604.

4.   The constituent members of 1230 Park Associates are Howard L. Parnes, a New York citizen, the James G. Houlihan Family Second L.P., a New York limited partnership whose general partner is a New York corporation, James J. Houlihan, a New York citizen, the James J. Houlihan Profit Sharing Plan, the Houlihan Family Partners, L.P., a New York limited partnership, the general partner of which is a New York corporation, John G. Houlihan, a New York citizen, Barbara Coyne, a new York citizen until her death, and Stanley Soltzer ("Soltzer"), a New York citizen.

5.   Plaintiff, Myrtle Boulevard Associates LLC ("Myrtle Boulevard") is a New York limited liability company with an address of One West Red Oak Lane, White Plains, New York 10604.

6.   The constituent members of Myrtle Boulevard are Howard Parnes, a New York citizen and Soltzer.

7.   Upon information and belief, defendant Hiram Sturm is an individual and a citizen of the State of Georgia with an address of 4381 Harris Valley Road, NW, Atlanta, Georgia 30327-8825.

## THE UNDERLYING FRAUD

### Summary

8.  This action is but one of the many ripples emanating from a fraudulent scheme constructed and orchestrated by a man named Stanley Soltzer, a former business associate of the principals of plaintiffs 1230 Park Associates and Myrtle Boulevard.

9.  In September 2006 it was learned that Soltzer was stealing from his associates.

10  Soltzer's fraud included embezzlement, unauthorized selling of property of others, unabashed theft, and "borrowing" hundreds of thousands of dollars from various third party lenders, most pertinently, Northern Source LLC ("Northern") and John Philip ("Philip") and the pledging of Plaintiffs' property as collateral for repayment of the loans.

11.  Soltzer had absolutely no authority to borrow any money on behalf of Plaintiffs nor to pledge Plaintiffs' property to secure such loans and Plaintiffs had no knowledge whatsoever that Soltzer was entering into these transactions and taking the money for his own purposes.

12.  Plaintiffs never received a single dollar of any of the proceeds from Soltzer's embezzlement, thievery, and illicit borrowing.

13.  This action seeks recovery of the proceeds of Soltzer's fraud which he illegally and fraudulently funneled to Defendant.

### Soltzer's Fraud

14.  On or about January 1, 1996, 1230 Park Associates was formed and its members executed a certain Operating Agreement of 1230 Park Associates, LLC (the "1230 Park Operating Agreement"), pursuant to New York Limited Liability Company Law.

15.   The purpose of 1230 Park Associates, as set forth in the Operating Agreement, was to "acquire, own, mortgage, construct, rehabilitate, improve, lease, operate and dispose of [the assets of the company which consists of shares of a cooperative apartment corporation known as 1230 Park Owners, Inc.]."

16.   The 1230 Park Operating Agreement establishes that 1230 Park Associates is to be managed by Operating Managers who are to be in a number equal to the number of members by providing at section 5.1 as follows:

> Each Member agrees to vote his interest in the Company and to take all further action as may be necessary so as to cause the election of as many Operating managers as there are Members of the Company. Each Member shall have the right to designate one Operating Manager. All Operating Managers must be Members of the Company.

17.   Pursuant to Section 5.4 of the Operating Agreement, the business of 1230 Park Associates was to be conducted by the Operating Managers, a majority of which must approve by vote all business activities, including, acquisition, disposition, mortgaging and leasing of assets.

18.   Soltzer was but one Operating Manager who alone did not constitute a majority.

19.   Among 1230 Park Associates' assets were cooperative apartments 8E, 8D, 7D, 8C and 3C, located in the building known as 1230 Park Avenue, New York, New York, the ownership of which were represented by the shares of stock in the cooperative corporation known as 1230 Park Owners Inc. (the "Cooperative"), and the respective proprietary leases for each of the aforementioned apartments.

20. On or about November 1, 2005, without any authority to do so, and in manifest violation of the 1230 Park Operating Agreement, Soltzer, ostensibly in the name of 1230 Park Associates, borrowed the sum of $250,000.00 from a third party called JL Funding LLC ("JL Funding") and secured repayment of the loan by purporting to pledge the stock shares of the Cooperative allocated to Unit 6C.

21. Soltzer had no authority to undertake such a loan.

22. Soltzer had no authority to pledge the stock shares to secure the loan.

23. Neither 1230 Park Associates nor any of its members had any knowledge of this transaction, and received no proceeds of the loan, which were all retained by Soltzer.

24. On or about November 30, 2005, without any authority to do so, and in manifest violation of the 1230 Park Operating Agreement, Soltzer, ostensibly in the name of 1230 Park Associates, borrowed the sum of $300,000.00 from JL Funding and secured the loan by purporting to pledge the stock shares of the Cooperative allocated to Unit 7D.

25. Soltzer had no authority to pledge the stock shares to secure the loan.

26. Neither 1230 Park Associates nor its members had any knowledge of this transaction, and received no proceeds of the loan, which were all retained by Soltzer.

27. On or about December 29, 2005, without any authority to do so, and in manifest violation of the 1230 Park Operating Agreement, Soltzer, ostensibly in the name of 1230 Park Associates, borrowed the sum of $225,000.00 from JL Funding and secured the loan by purporting to pledge the stock shares of the Cooperative allocated to Unit 8E.

28. Soltzer had no authority to undertake such a loan.

29. Soltzer had no authority to pledge the stock shares to secure the loan.

30.   Neither 1230 Park Associates nor its members had any knowledge of this transaction, and received no proceeds of the loan, which were all retained by Soltzer.

31.   The aforementioned loans are all currently held by an affiliated entity of JL Funding known as Northern Source, LLC.

32.   On or about June 1, 2006, without any authority to do so, and in manifest violation of the 1230 Park Operating Agreement, Soltzer, ostensibly in the name of 1230 Park Associates, borrowed the sum of $350,000.00 from Philip and secured the loan by purporting to pledge the stock shares of the Cooperative allocated to Unit 8D.

33.   Soltzer had no authority to undertake such a loan.

34.   Soltzer had no authority to pledge the stock shares to secure the loan.

35.   Neither 1230 Park Associates nor its members had any knowledge of this transaction, and received no proceeds of the loan, all of which were retained by Soltzer.

36.   In or around the summer of 2006, Soltzer entered into a contract of sale for the purchase and sale of Unit 8D of the Cooperative.

37.   Soltzer had no authority to enter into the contract of sale for the purchase and sale of Unit 8D.

38.   On or about September 1, 2006, without any authority to do so, and in manifest violation of the Operating Agreement, Soltzer, ostensibly on behalf of 1230 Park Associates, sold Unit 8D for the sum of $1,800,000.00 and transferred to a third party or parties the stock shares of the Cooperative allocated to Unit 8D.

39.   Just days before the closing on title for Unit 8D, by happenstance, 1230 Park Associates learned of the impending closing, however, such knowledge – limited only to the date

and the purchase price – came too late to prevent the unauthorized transaction.

40.   While 1230 Park Associates was able to seize the balance of net proceeds, the Philip loan was required to be repaid resulting in the remaining members of 1230 Park Associates each receiving far less than the amounts they were due for their respective ownership interests.

41.   Furthermore, Soltzer paid from the sale proceeds, the sum of $27,720.00 representing the balance due under a personal loan he had borrowed from one Edward B. Yontef.

42.   Because of Soltzer's illegal and unauthorized loan from Philip, 1230 Park Associates did not receive an amount of money, no less than $148,140.64 to which it was otherwise entitled.

43.   From, at the latest, April 2006, Soltzer collected all rents from 1230 Park Associates' units in the building and diverted the funds from company business and towards his own personal use.

44.   From, at the latest, April 2006, Soltzer failed or refused to pay the cooperative maintenance charges for each apartment, imperiling 1230 Park Associates' assets and causing extensive financial damages to the company and its members.

45.   At some point in time after June 1, 2006, and unbeknownst to 1230 Park Associates, its members or its Operating Managers, and without any authority to do so, and in manifest violation of the Operating Agreement, Soltzer, ostensibly in the name of 1230 Park Associates, borrowed an unknown sum of money from Philip and secured the loan by purporting to pledge the stock shares of the Cooperative allocated to Unit 3C.

46.   Soltzer had no authority to undertake such a loan.

47.   Soltzer had no authority to pledge the stock shares to secure the loan.

7

48.   Neither 1230 Park Associates nor its members had any knowledge of this transaction, and received no proceeds of the loan, which were all retained by Soltzer.

49.   During the course of owning the several apartments in 1230 Park Avenue, the members were, at times, called upon to add additional capital to the company and, at other times, were entitled to distribution of capital from the company.

50.   A review of records available to 1230 Park Associates reveals that Soltzer has, over the course of years, siphoned from 1230 Park Associates, no less than the sum of $309,460.00, while the balance of innocent members went unpaid by that same amount.

51.   Upon information and belief, during the period of time from 2004-2006, Soltzer absconded with no less than $309,460.00 of his fellow members capital in 1230 Park Associates.

52.   The individual members of 1230 Park Associates other than Soltzer constitute 84% of the ownership of the limited liability company and they are entitled to 84% of all assets of the entity and 84% of all proceeds arising from such assets.

53.   Based upon the illegal loan transactions which 1230 Park Associates is at this time able to quantify – the second Philip loan is in an amount not currently known – 1230 Park Associates, on behalf of its innocent members, is entitled to 84% of the loan proceeds wrongfully procured by, and then wrongfully retained by, Soltzer, which percentage is equal to the sum of $945,000.00 as well as repayment of the purloined $309,460.00 stolen from the 1230 Park Associates capital accounts.

54.   Plaintiff 1230 Park Associates is further entitled to interest accrued on such amounts.

55.   Myrtle Boulevard was formed to acquire, own, lease, operate and dispose of certain cooperative apartments located in the building known as 172 Myrtle Boulevard, Larchmont, New York, including specifically, units 5A and 6D.

56.   On or about February 28, 2006, without any authority to do so, and in manifest violation of the Operating Agreement governing Myrtle Boulevard, Soltzer, ostensibly in the name of Myrtle Boulevard, borrowed the sum of $90,000.00 from Northern Source and secured the loan by purporting to pledge the stock shares of the Cooperative allocated to Unit 6D.

57.   Soltzer had no authority to undertake such a loan.

58.   Soltzer had no authority to pledge the stock shares to secure the loan.

59.   Neither Myrtle Boulevard nor its other member had any knowledge of this transaction, and received no proceeds of the loan, which were all retained by Soltzer.

60.   Unbeknownst to Myrtle Boulevard Associates, and its other member, in or about June 2006, without any authority to do so, and in manifest violation of the Operating Agreement governing Myrtle Boulevard, Soltzer, ostensibly on behalf of Myrtle Boulevard, sold Unit 5A for an unknown amount, believed to be in excess of $200,000.00.

61.   Soltzer had no authority to enter into a contract of sale for the sale of Unit 5A.

62.   Soltzer had no authority to consummate the purchase and sale of Unit 5A.

63.   Neither Myrtle Boulevard Associates nor its other member had any knowledge of this transaction, and received no proceeds arising from the transaction, which were all retained by Soltzer.

64.   Based upon the foregoing illegal transaction, Soltzer absconded with the closing proceeds from the sale of Unit 5A, believed to be in excess of $200,000.00,  while

9

simultaneously wrongfully disposing of company assets for his own purposes.

65.    The other member of Myrtle Boulevard Associates, Parnes Family, L.P., owns 60% of the ownership of the limited liability company and he is entitled to 60% of all assets of the entity and 60% of all proceeds arising from such assets.

66.    Based upon the illegal transaction which Soltzer perpetrated, Myrtle Boulevard Associates, on behalf of its innocent member, the Parnes Family L.P., is entitled to 60% of the closing proceeds wrongfully procured by, and then wrongfully retained by, Soltzer, which percentage is believed to be no less than $122,000.00.

67.    After Soltzer's fraud and nefarious transactions began to come to light, but before the extent of it was realized,  Soltzer sought to placate Myrtle Boulevard Associates and the innocent member, Parnes Family, L.P., by delivering two checks to Parnes Family, L.P., one in the amount of $121,169.00 and the second in the amount of $1,580.00.

68.    Soltzer represented that combined, these two checks represented Parnes Family L.P.'s share of the sale proceeds from the sale of Unit 5A.

69.    An inquiry to the bank upon which the checks were drawn revealed that the bank account contained no money to cover the payments, and the checks were worthless.

70.    Soltzer frequently transferred the money obtained from the illegal loans, the illegal sales and the embezzled rents and maintenance between and among several accounts located at Hudson Valley Bank and Washington Mutual Bank which he held in the names of Vancor Realty, 1230 Park Associates, 1230 Management, Arch Street Norwalk Realty LLC, Myrtle Boulevard Associates as well as in his own name.

## THE FRAUDULENT TRANSFERS

71.    On or about December 12, 2005, with full knowledge of his acts of embezzlement, theft and his illegal transactions whereby he came into possession of well over one million dollars rightfully belonging to Plaintiffs, and just two weeks after illegally "borrowing" $250,000.00 from Northern Source, Soltzer paid to Defendant, his brother-in-law,  the sum of $50,000.00 of his stolen money.

72.    On or about March 20, 2006, with full knowledge of his acts of embezzlement, theft and his illegal transactions whereby he came into possession of well over one million dollars rightfully belonging to Plaintiffs, and just three weeks after illegally "borrowing" $90,000.00 from Northern Source, Soltzer paid to Defendant, his brother-in-law, the sum of $25,000.00 of his stolen money.

73.    On or about March 20, 2006, with full knowledge of his acts of embezzlement, theft and his illegal transactions whereby he came into possession of well over one million dollars rightfully belonging to Plaintiffs, and just three weeks after illegally "borrowing" $90,000.00 from Northern Source, Soltzer paid to Defendant, his brother-in-law, the sum of $25,000.00 of his stolen money.

74.    On or about May 5, 2006, with full knowledge of his acts of embezzlement, theft and his illegal transactions whereby he came into possession of well over one million dollars rightfully belonging to Plaintiffs, Soltzer paid to Defendant, his brother-in-law, the sum of $25,000.00 of his stolen money.

75.    On or about June 1, 2006, with full knowledge of his acts of embezzlement, theft and his illegal transactions whereby he came into possession of well over one million dollars

11

rightfully belonging to Plaintiffs, and on the very day he illegally "borrowed" $350,000.00 from Philip, Soltzer paid to Defendant, his brother-in-law, the sum of $25,000.00 of his stolen money.

76.    Upon information and belief, Soltzer received no consideration in return for any of these payments.

77.    Upon information and belief, Soltzer made other fraudulent conveyances to Defendant about which information is currently lacking.

78.    To the extent that any antecedent debt or obligation existed by which Soltzer was indebted to Defendant, the payments made by Soltzer to Defendant were made with stolen funds to which Plaintiffs have a greater claim than does Defendant.

FIRST CLAIM<br>(New York Debtor and Creditor Law - Section 273)

79.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.    The transfer of purloined funds from Soltzer to Defendant were made without fair consideration.

81.    At the time the purloined funds were transferred by Soltzer to Defendant, Soltzer had insufficient assets to pay his obligations to Plaintiffs or his many other creditors.

82.    Whatever assets Soltzer had in his possession were either stolen or otherwise ill-gotten or had been pledged and/or mortgaged to the extent that Soltzer had no equity.

83.    In light of the foregoing, the payments made to Defendant constitute fraudulent conveyances relative to Plaintiffs.

84.  Plaintiffs are therefore entitled to judgment directing that Defendant disgorge and repay to Plaintiffs the sum of $150,000.00 representing the total amount of fraudulent payments made by Soltzer to Defendant, plus interest thereon from the date of the fraudulent conveyance.

SECOND CLAIM
(New York Debtor and Creditor Law - Section 275)

85.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.  The transfer of purloined funds from Soltzer to Defendant were made without fair consideration.

87.  At the time the purloined funds were transferred by Soltzer to Defendant, Soltzer had insufficient assets to pay his obligations to Plaintiffs or his many other creditors and he knew or should have known that he had and would continue to have debt beyond his ability to repay.

88.  Whatever assets Soltzer had in his possession were either stolen or otherwise ill-gotten or had been pledged and/or mortgaged to the extent that Soltzer had no equity and Soltzer knew or should have known that he had and would continue to have debt beyond his ability to repay.

89.  In light of the foregoing, the payments made to Defendant constitute fraudulent conveyances relative to Plaintiffs.

90.  Plaintiffs are therefore entitled to judgment directing that Defendant disgorge and repay to Plaintiffs the sum of $150,000.00 representing the total amount of fraudulent payments made by Soltzer to Defendant, plus interest thereon from the date of the fraudulent conveyance.

THIRD CLAIM
(New York Debtor and Creditor Law - Section 276)

91.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.    The transfer of purloined funds from Soltzer to Defendant were made without fair consideration.

93.    At the time the purloined funds were transferred by Soltzer to Defendant, Soltzer had insufficient assets to pay his obligations to Plaintiffs or his many other creditors.

94.    The transfer of the purloined funds from Soltzer to Defendant were made with actual intent by Soltzer to continue to hinder, delay and defraud the Plaintiffs, and was therefore fraudulent as to Plaintiffs.

95.    At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

96.    In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

97.    The conveyances and transfers deprived Soltzer of sufficient means to satisfy his indebtedness to Plaintiffs.

98. In light of the foregoing, the payments made to Defendant constitute fraudulent conveyances relative to Plaintiffs.

99. Plaintiffs are therefore entitled to judgment directing that Defendant disgorge and repay to Plaintiffs the sum of $150,000.00 representing the total amount of fraudulent payments made by Soltzer to Defendant, plus interest thereon from the date of the fraudulent conveyance.

FOURTH CLAIM
(New York Debtor and Creditor Law - Section 278)

100. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101. The transfer of the purloined funds from Soltzer to Defendant were made by Soltzer to Defendant were fraudulent as to Plaintiffs inasmuch as Plaintiffs claims against Soltzer had matured and were due and owing.

102. At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

103. In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

104.   The conveyances and transfers deprived Soltzer of sufficient means to satisfy his indebtedness to Plaintiffs.

105.   Plaintiffs are therefore entitled to judgment directing that Defendant disgorge and repay to Plaintiffs the sum of $150,000.00 representing the total amount of fraudulent payments made by Soltzer to Defendant, plus interest thereon from the date of the fraudulent conveyance.

FIFTH CLAIM
(New York Debtor and Creditor Law - Section 279)

106.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 105 of this Complaint as if fully set forth herein.

107.   The transfer of the purloined funds from Soltzer to Defendant  were made by Soltzer to Defendant were fraudulent as to Plaintiffs inasmuch as Plaintiffs claims against Soltzer had not yet matured but were nevertheless owed to Plaintiffs.

108.   At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

109.   In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

110.  The conveyances and transfers deprived Soltzer of sufficient means to satisfy his indebtedness to Plaintiffs.

111.  Plaintiffs are therefore entitled to judgment directing that Defendant disgorge and repay to Plaintiffs the sum of $150,000.00 representing the total amount of fraudulent payments made by Soltzer to Defendant, plus interest thereon from the date of the fraudulent conveyance.

112.  Alternatively, Plaintiffs are entitled to judgment restraining Defendant from disposing the purloined funds pending final determination of this matter.

113.  Alternatively, Plaintiffs are entitled to judgment setting aside and annulling the payments and directing Defendant to pay to Plaintiffs the sums fraudulently paid by Soltzer to Defendant.

SIXTH CLAIM
(Wrongful Preference)

114.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 113 of this Complaint as it fully set forth herein.

115.  The transfer of purloined funds from Soltzer to Defendant were made without fair consideration.

116.  At the time the purloined funds were transferred by Soltzer to Defendant, Soltzer had insufficient assets to pay his obligations to Plaintiffs or his many other creditors.

117.  The transfer of the purloined funds from Soltzer to Defendant were made with actual intent by Soltzer to continue to hinder, delay and defraud the Plaintiffs, and was therefore fraudulent as to Plaintiffs.

118. At the time of such transfer of the purloined funds, Soltzer knew that such money had been stolen, embezzled or otherwise wrongfully obtained by him at the expense of Plaintiffs.

119. Such payments were made with the intent of effecting a preference in favor of Defendant over the righteous claims of Plaintiffs.

120. At the time of such transfer of money, Soltzer and Defendant had reason to believe that such payments would effect a preference.

121. At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

122. In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

123. The conveyances and transfers deprived Soltzer of sufficient means to satisfy his indebtedness to Plaintiffs.

124. But for such transfers to Defendant, the money paid to Defendant would have been available for partial satisfaction of Plaintiffs' claims against Soltzer.

## SEVENTH CLAIM
### (Monies Had and Received)

125.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 124 of this Complaint as it fully set forth herein.

126.    The transfer of the purloined funds from Soltzer to Defendant were made with actual intent by Soltzer to continue to hinder, delay and defraud the Plaintiffs, and was therefore fraudulent as to Plaintiffs.

127.    At the time of such transfer of the purloined funds, Soltzer knew that such money had been stolen, embezzled or otherwise wrongfully obtained by him at the expense of Plaintiffs.

128.    At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

129.    In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

130.    The money paid to Defendant was stolen from Plaintiffs.

131.    Defendant has received the benefit of possessing and utilizing Plaintiffs' money despite Plaintiffs' greater entitlement to use and possession of such money.

132.  Defendant should not be permitted to keep the money stolen from Plaintiffs in derivation of Plaintiffs' superior right and entitlement to such funds.

133.  Plaintiffs are entitled to judgment against Defendant in the amount of $150,000.00 plus interest thereon from the date of the payments to Defendant.

EIGHTH CLAIM
(Unjust Enrichment)

134.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 133 of this Complaint as it fully set forth herein.

135.   The transfer of the purloined funds from Soltzer to Defendant  were made with actual intent by Soltzer to continue to hinder, delay and defraud the Plaintiffs, and was therefore fraudulent as to Plaintiffs.

136.   At the time of such transfer of the purloined funds, Soltzer knew that such money had been stolen, embezzled or otherwise wrongfully obtained by him at the expense of Plaintiffs.

137.   At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

138.   In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

20

139.  The money paid to Defendant was stolen from Plaintiffs.

140.  Defendant has been unjustly enriched by possessing and utilizing Plaintiffs' money despite Plaintiffs' greater entitlement to use and possession of such money.

141.  Defendant should not be permitted to keep the money stolen from Plaintiffs in derivation of Plaintiffs' superior right and entitlement to such funds.

142.  Plaintiffs are entitled to judgment against Defendant in the amount of $150,000.00 plus interest thereon from the date of the payments to Defendant.

### NINTH CLAIM
### (New York Debtor and Creditor Law - Section 276-a)

143.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 142 of this Complaint as if fully set forth herein.

144.  The transfer of purloined funds from Soltzer to Defendant  were made without fair consideration.

145.  At the time the purloined funds were transferred by Soltzer to Defendant, Soltzer had insufficient assets to pay his obligations to Plaintiffs or his many other creditors.

146.  At all relevant times mentioned herein, Soltzer knew he was engaged in a fraudulent scheme to defraud Plaintiffs.

147.  In furtherance of said scheme, at a time when he had already implemented and was actively engaged in his fraudulent scheme to defraud Plaintiffs and deprive Plaintiffs of their funds, money, assets and property and was indebted to Plaintiffs, Soltzer transferred to Defendant money as aforesaid for no or inadequate consideration, with the intent to place his assets beyond the reach of the Plaintiffs, and to prevent said money from being recovered by legal process, and

with the intent thereby of defrauding the Plaintiffs and preventing Plaintiffs from securing payment of the indebtedness or to hinder or delay its collection.

148.    The conveyances and transfers deprived Soltzer of sufficient means to satisfy his indebtedness to Plaintiffs.

149.    In light of the foregoing, Plaintiffs are entitled to judgment in the amount of the reasonable attorneys' fees to be determined by the Court after hearing or inquest.

WHEREFORE, plaintiff demands judgment against defendants as follows:

(A)    On the First Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of fraudulent transfers; and

(B)    On the Second Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of fraudulent transfers; and

(C)    On the Third Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of fraudulent transfers; and

(D)    On the Fourth Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of fraudulent transfers; and

(E)    On the Fifth Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of fraudulent transfers; and

(F)    On the Sixth Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of fraudulent transfers; and

(G)    On the Seventh Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of the fraudulent conveyances; and

(H)     On the Eighth Claim, judgment against the Defendant, Hiram Sturm, in the amount of $150,000.00 plus interest thereon from the dates of the fraudulent conveyances; and

(I)     On the Ninth Claim, judgment against the Defendant, Hiram Sturm, in the amount of Plaintiff's reasonable attorneys' fees the amount of which to be determined at trial; and

(J)     the costs and expenses incurred by Plaintiffs herein; and

(K)     such further and different relief as the Court may deem just and appropriate in these circumstances.

Dated:     New York, New York
           May 8, 2007

                         GOLDBERG WEPRIN & USTIN LLP

                         By: _____
                         By:   Matthew Hearle (MH-3596)

                         1501 Broadway
                         22nd Floor
                         New York, New York 10036
                         (212) 221-5700

                         Attorneys for Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs respectfully reserve the right to request a trial by jury in this matter.

23